PEREGO *v.* LAKE SHORE & MICHIGAN SOUTHERN RAIL-
WAY CO.

1. NEGLIGENCE—RAILROADS—DEPOTS AND GROUNDS—CARRIERS OF
PASSENGERS.
A railroad company which provides a safe way for the depart-
ure of travelers from its station, and which posts warnings
against crossing its right of way in other places, is not liable
for the death of a boy of less than nine years who left the way
provided, and in crossing the tracks was struck by a switch
engine, without gross negligence of the company's employés.

2. SAME—GROSS NEGLIGENCE—PRECAUTIONS REQUIRED—CONTRIB-
UTORY NEGLIGENCE.
The fact that a fireman in the switch engine saw the boy ap-
proaching the track and omitted to notify the engineer, be-
cause he thought the boy had time to cross, is not sufficient to
sustain a charge of gross negligence, where it appeared that
the deceased could have crossed in safety had he not turned
and tried to recross.

Error to Hillsdale; Chester, J. Submitted June 17,
1909. (Docket No. 28.) Decided September 21, 1909.

Case by Marvin L. Perego, administrator of the estate
of Ralph Austin Perego, deceased, against the Lake Shore
& Michigan Southern Railway Company for the negligent
killing of plaintiff's intestate. A judgment for plaintiff
is reviewed by defendant on writ of error. Reversed,
and no new trial ordered.

*Herbert R. Clark*, for appellant.

*F. A. Lyon*, for appellee.

Plaintiff's decedent, a boy 8½ years old, was killed
while crossing the tracks in the defendant's yard, opposite
the passenger house, being struck by the tender of an en-
gine which was backing on a switch track. The boy

lived in Chicago. He and his brother, about 20 years old, had come to visit their uncle, the administrator in this case, who lived in a town some miles from Hillsdale. On the morning of the accident deceased with his brother and his uncle came over the Ft. Wayne branch of defendant's road to Hillsdale on their way home to Chicago.

The defendant's depot grounds are surrounded on the north by Monroe street, on the south by Railroad street, on the east by Hillsdale street, and on the west by West street. The passenger depot is located on the north, fronting Monroe street and about the middle of the block. The first track south is the main track of the defendant's road, running east and west. The second track is known as the Ft. Wayne track. The third track is the middle siding. The fourth track is known as the house track. South of these four tracks are located the freighthouses. South of the freighthouses are two other tracks, the first one being for storing cars, and the last one, called the Plug track, on which cars were stationed for unloading. Track No. 4, the house track, ran to the north side of the freight depot which was located south and east of the passenger depot. The passenger platform extended from the passenger depot across the main line track to the Ft. Wayne track for the accommodation of passengers going to and from the Ft. Wayne train. South of the Ft. Wayne track the tracks were not filled level with the rails.

When the Ft. Wayne train arrived, on which the deceased, his brother, and their uncle were passengers, it stopped in front of the depot. The main line passenger train going east was then standing on the main line track. A passenger train for Lansing, facing north, was standing on the spur track north of the main track with its dead end west of the passenger depot. A train for Ypsilanti was standing on another spur track, which was north of the main line track, with its dead end east of the passenger depot. The third track or middle siding was occupied by a solid string of box cars extending beyond the end of the Ft. Wayne train. This track was usually so occupied.

A switch engine was at the time engaged in switching on the plug and house tracks. The passengers of the Ft. Wayne train disembarked on the north side of the train and passed west in a line to go around the rear of the main line passenger train to the passenger depot; the deceased, his uncle, and brother being among them. Another line of passengers was coming from the depot to take the Ft. Wayne train. When about opposite the engine of the Ft. Wayne train, they stopped for the brother to go back to the car and get his handkerchief, which he thought he had left there. On his return they started west; the uncle and brother each carrying valises. The deceased then almost immediately ran past the uncle and brother, and went diagonally across the yards around the end of the box cars and onto the fourth or house track, where he was run over by the switch engine backing out from the plug or sixth track to switch onto the house track. It appears that a large portion of the city of Hillsdale is situated to the south of the depot and grounds, and that people were in the habit, instead of coming out upon Monroe street and going around in the way provided, to cross all these tracks to the south. It appears that this was done to such an extent that there was a beaten path. The uncle and brother were not intending to go across these tracks, but intended to go west to West street.

Plaintiff testified as follows :

" The first I can recollect of anything occurring unusual, my mind, as I think you stated, was to go to West street, and I was walking in that direction, and by some means, possibly—I don't know, I wouldn't attempt to give any reason, but I think—it is my recollection that the young man sitting here was ahead of me, and, as we got up in past the engine that backed our train in there, we stopped over that, in front of that engine, and right at that point. The first I knew the little boy passed me, and what makes me so positive that the young man was ahead of me is that it is firmly stamped in my memory that I saw him make a dive to grab him, but he had his suitcase, and he slipped off, couldn't stop him, and he kept on turning to the left and crossing the tracks. I

was just on the point of saying, 'Don't cross here,' when the imminent danger of the boy interfered, and I cried out to the boy to come back.   He kept on.   *   *   *   He didn't seem to hear us, our calling.   We were both calling to him, but he seemed to see something where he was going, and bent in that direction.   As he got on the track, the engine was—shot out from behind those freight cars, and was right upon him, and he saw it, saw his danger, and attempted to come back, and in his turning to come back he stumbled over the rails and fell with his right limb and arm over the rail and the left hand under him apparently, judging from the way he was mangled, and the tender passed over him and threw him out, so that the balance of the engine, as near as I can remember, didn't hit him, threw him outside."

On cross-examination plaintiff testified that the boy "was running just as a little boy would start up when he attempted to run by people; that, when he went by me, I says, 'We aren't to cross there,' but he kept right on, and at the same time his brother made a grab for him."

Again on rédirect examination he testified:

"Well, of course, he hastened.   He hastened by me. I can't say that he was running as swift as a boy would run to win a race, but he did just like anybody when he attempted to dodge by a person.   The first thing I knew he flitted by me, and was going across the track."

The brother saw the engine and the smoke above the freight cars, and realized the danger in which his brother was.   He also called to his brother and warned him of it, but the boy continued in his course.

The company had posted three signs in the vicinity warning people not to cross.   One of those signs reads as follows:

" Notice.
"Railroad Grounds.
"No Thoroughfare.
"No Trespassing Allowed.
"Dangerous."

Railroad employés had also repeatedly warned parties not to cross there, but travelers persisted in doing so.

The deceased had never been there before, had not been invited to go there, or told by his uncle or brother to go there. The fireman looked out of the cab and caught a glimpse of the boy as he was running towards the track upon which he was switching. He did not inform the engineer that there was any danger. He had often seen boys run across there before, and testified that he thought he had time to get across. The engineer was on the opposite side of the cab.

Counsel for plaintiff conceded upon the trial that it was not the duty of the company to provide a way for people to cross there, and that they had no right to do so. The declaration alleges that the boy "was a bright, strong, intelligent, healthy, and robust child." The evidence also shows that he was able to take care of himself and avoid danger on the streets of Chicago. His brother testified:

"*Q.* Did you say anything to your brother about being careful, or anything of that kind, give him any caution?

"*A.* It wasn't necessary to caution him. He was old enough to take care of himself. I have seen him on the streets at home, and he went out of the way of an approaching buggy, and I have seen him do it time and again, automobiles, and such things, never had any necessity for cautioning him."

At the close of the plaintiff's case both parties rested, and the court was requested to direct a verdict for the defendant, which request was denied.

GRANT, J. (*after stating the facts*). The defendant had performed its entire duty to prevent parties crossing its yard and grounds at this place. It had posted warning notices, and had frequently notified travelers against crossing there. It had provided a safe approach from its tracks to its depot, and it was the legal duty of passengers to go to and depart from trains in the way provided. Many trains were going in and out daily, both passenger and freight, and switching of cars was continually going on. The danger was apparent. A traveler choosing to depart

from the safe way provided and taking a dangerous way, one where he had no right to go, assumes all the risks and dangers incident to the work to be done in the ordinary way.

Only in case of gross negligence can the defendant be held liable for injury to one departing from the way provided into one not provided and where he was prohibited from going. Plaintiff's counsel, however, strenuously insists that there was evidence of gross negligence. This is based solely upon the fact that the fireman caught a glimpse of the boy just as he emerged from behind the box cars, and was almost upon the track, and did not notify the engineer. It is quite probable that if the boy had not stopped and turned around to escape, in doing which he fell, but had continued his running, he would have crossed in safety. Whether the boy saw the approaching tender and stopped or whether he stopped in response to the calls of his uncle and brother is a matter of conjecture. The fireman testified that boys had frequently run in front of approaching trains before. There is no evidence that any like accident had ever occurred. We cannot hold that the fireman was guilty of grossly inhuman conduct in not turning and notifying the engineer that a boy was trying to cross the track. It is no uncommon thing for boys to run across tracks in front of approaching trains, and the evidence shows that it was frequently done by boys at this place. If the engineers were obliged to stop their trains every time a boy undertook to cross in front of them, it would seriously interfere with the running of trains. The bell on the engine was ringing, was heard by others, and the fireman had the right to presume that the boy heard it, and believed that he could safely cross as also did the fireman. Under these circumstances, the defendant cannot be held guilty of gross negligence either in the failure of the fireman to notify the engineer or the failure to keep a person upon the rear of the tender to notify parties choosing to cross there. Defendant owed no duty to travelers to station a man at this place to prevent

them from trespassing, or to station a man upon the rear of backing trains to warn them of their approach.

It was held in *Trudell* v. *Railway Co.*, 126 Mich. 73 (85 N. W. 250, 53 L. R. A. 271), that a railroad company was not guilty of gross negligence in running down a boy seven years and four months old upon its right of way, from the fact that he stood on the track in full view of those in charge of the approaching engine for some two minutes before being struck, since the company's agents, if they saw the boy, were justified in believing that he would step off the track in time to avoid the injury. The same principle controls this case. There is no difference in principle between a boy standing upon the track and one attempting to run across in front of a train. We cannot hold that this fireman recklessly caused this boy to be run over on the ground that he saw him in imminent danger. In the *Trudell Case* the boy was held guilty of contributory negligence. If the boy in that case was guilty of contributory negligence, equally so was he in this case. He was a trespasser, and for some reason left the company of his guardians and rushed into danger which was apparent to every one in the vicinity.

Judgment reversed, and no new trial ordered.

BLAIR, C. J., and MONTGOMERY, McALVAY, and BROOKE, JJ., concurred.