WINNIE *v.* LAKE SHORE & MICHIGAN SOUTHERN RAIL-
WAY CO.

NEGLIGENCE—RAILROADS—CROSSING—GIVING WARNING.

> An employé of the defendant who was crossing its tracks after
> working hours, in a place where the company maintained
> danger signs marked "No Thoroughfare," in its yards, can-
> not recover for injuries sustained by being hit by an engine,
> on the theory that the company owed a duty to the travel-
> ing public to use lights on its engine and to give a warning
> signal.[1]

Error to Lenawee; Chester, J. Submitted November
11, 1909. (Docket No. 32.) Decided March 19, 1910.

Case by Albert Winnie against the Lake Shore & Mich-
igan Southern Railway Company for personal injuries.
A judgment for plaintiff is reviewed by defendant on writ
of error. Reversed.

*Herbert R. Clark*, for appellant.

*Smith, Baldwin & Alexander*, for appellee.

MONTGOMERY, C. J. The plaintiff in this action recov-
ered a judgment for personal injuries received in the rail-
road yards of defendant at Adrian, Mich. The facts,
briefly stated, are that the defendant's railroad passes
through the southerly part of the city of Adrian in an east-
erly and westerly direction. North of its tracks and
yards, and extending in an easterly and westerly direction,
is Michigan street. The first street south of the tracks
and yard is Treat street. The next east and west street
south of Treat street is Beecher street. Between Treat
street and Beecher is a tract of platted land built up and
populated. The defendant's passenger station is on the

[1]As to duty of railroad company to keep lookout for trespassers
on track, see note to *Frye* v. *Railway Co.* (Mo.), 8 L. R. A. (N. S.)
1069.

north side of its tracks, the south side of Michigan street, and directly east of Tecumseh street. The street south of this track extending north and south which would clearly intersect Tecumseh street if extended is James street. The first street east of this is Tabor street. The first north and south street west of Tecumseh street is Center street, which is about 30 or 40 rods west of the passenger station. The first public road crossing the defendant's tracks east of the station is some three-fourths of a mile distant. The factories where many of the men living south of defendant's tracks worked were north and east. The business portion of the city is also north of defendant's tracks. The school children and laboring men who worked in these factories had to cross the tracks, and in so doing either had to go west to Center street and then east on Michigan street, or pass from James street to Michigan street over the tracks of defendant. The railroad company maintained warning signs in its yards, to notify people that there was no thoroughfare, that no trespassing was allowed, and that the place was dangerous. Notwithstanding this, people had, as the evidence showed, quite generally been passing over the tracks of the defendant from Treat street to Michigan street, but whether at the precise point at which plaintiff received the injury there was some doubt. But it would appear that tracks had been worn by people passing over these tracks frequently.

The plaintiff had been in the employ of the defendant for many years. On the day in question, he had been at work unloading lumber, and had used for that purpose a scaffolding near one of defendant's tracks. He quit work between 4 and 5 o'clock and went home to his supper. It appears that a freight conductor, a Mr. Sigsbee, boarded at plaintiff's house, and he went to the station, as he testifies, to ascertain when Mr. Sigsbee's train would likely be in. He strolled over from there to the car laborers' shanty, which occupied a place between two diverging tracks in the yard, and engaged in conversation with Mr. Mol-

loy, the car repairer. He testified that he then bethought him that this scaffolding which had been left near the tracks might project and cause injury to some one, and he thought it was his duty to go and remove it. He gave testimony that one of the defendant's employés, Mr. O'Neil, had told him to look after the interests of the defendant at all times, and to look after anything that might result in danger or injury to any of defendant's employés, and it was in pursuance of this direction that he went to remove the scaffolding. While crossing one of the tracks in this direction, an engine which was being taken to the roundhouse, and which had no light upon it, and was run without the ringing of the bell or blowing the whistle, ran against him and caused the injury. The plaintiff had three theories: One was that the defendant was grossly negligent in running its engine without lights and without bell or whistle. This theory was not submitted to the jury. The second theory was that the plaintiff was rightfully there as a part of the traveling public, and that the defendant owed him the duty of a traveler. *Third*, that the plaintiff was rightfully there as an employé under the master's orders to look after defendant's affairs, and that James Hamilton, who ran the engine upon him, was not a competent man to do the work assigned him, and for that reason the fellow-servant rule did not apply.

The case was submitted to the jury upon the two last-named propositions, the circuit judge instructing the jury, in effect, that if the public had traveled over these tracks to such an extent that the defendant company knew or ought to have known of the custom, and had not stopped it, and had been accustomed to use lights and give warnings, the failure to use the lights and give the warning on this occasion would be a breach of duty to the plaintiff, and he would be entitled to recover. The court also submitted the case to the jury upon the theory that the plaintiff was engaged in his duties as a workman for defendant at the time, and that while the act of Hamilton would be that of a fellow-servant, and therefore no recovery could

be had for his negligence, except upon the theory that he was incompetent and known to be so by the company, or employed under such circumstances as would impute knowledge of the fact of his incompetency, yet if such knowledge was shown, or the circumstances were such as to impute the knowledge of his incompetency, the fellow-servant rule would not obtain, and if the company was negligent in the particulars named—a failure to have lights and give warning—a recovery could be had.

We think the case should not have been submitted to the jury upon the first question. It is difficult to conceive what more this company could have done to give warning to the general public that this was a place of danger. The evidence tended to show that a fence had been maintained which had been torn down from time to time. The yard was very plainly devoted to railroad tracks, in which cars and engines were frequently moving back and forth and were of themselves a warning of danger, and, with the notices posted as they were, the public who saw fit to pass over these tracks did so with full knowledge of the danger. Except by stationing men at the highway along the track, it is impossible to conceive how the company could have more effectively warned the public that this territory was not a thoroughfare. The case upon this point is very similar to that of *Perego* v. *Railway Co.*, 158 Mich. 225 (122 N. W. 535).

As the case must be reversed upon this ground, it is not necessary to discuss the other question raised, further than to say that the testimony that the plaintiff was acting in pursuance of a duty he owed to the railroad company in the line of his employment is so meager as to make it hardly believable that the jury rested its verdict upon any such theory of the case.

We think error was committed in submitting the case upon the theory first stated, and that the judgment should be reversed and a new trial ordered.

OSTRANDER, HOOKER, BROOKE, and BLAIR, JJ., concurred.