DUBE *v.* NORTHWESTERN COOPERAGE & LUMBER CO.

1. NEGLIGENCE—OWNER'S DUTY TO LICENSEE.
   The owner of premises owes to a licensee the duty to warn him of any existing dangers known or discoverable in the exercise of reasonable care, and unknown to said licensee.

2. SAME—INVITEE—LICENSEE—DIRECTED VERDICT.
   Where plaintiff's decedent was accidentally killed while on defendant's grounds, and there was no fact or circumstance contributing to decedent's injury in connection with the visible obstruction to the path unknown to decedent which was known or which, on the evidence, should have been known to defendant's agents, whether decedent was an invitee or a licensee is unimportant, and the trial judge properly directed a verdict for defendant.

Error to Delta; Flannigan (Richard C.), J. Submitted January 20, 1920. (Docket No. 9.) Decided April 10, 1920.

Case by Peter C. Dube, Sr., administrator of the estate of Joseph Desrochers, deceased, against the Northwestern Cooperage & Lumber Company for the alleged negligent killing of plaintiff's decedent. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

*Henry R. Dotsch* (*Judd Yelland,* of counsel), for appellant.

*G. R. Empson,* for appellee.

BROOKE, J. Plaintiff's decedent received, on the premises of defendant, injuries from which he later died. This suit was brought to recover damages growing out of the death of plaintiff's decedent and is predicated on the alleged actionable negligence of the de-

On duty of owner of land which licensees are accustomed to cross, to guard against injuries in consequence of changes in the conditions, see notes in 13 L. R. A. (N. S.) 1126, and 39 L. R. A. (N. S.) 217.

fendant. At the close of the plaintiff's case, a motion was made for a directed verdict, upon several grounds.. This motion was granted. Later, upon denying a motion for a new trial, the court delivered the following opinion:

"The defendant is a corporation engaged in the manufacture of lumber and other forest products at Gladstone, Delta county. It owns an extensive mill and lumber yard which is surrounded by a board fence eight feet high with two strands of wire running along the top, further extending its height about eighteen inches. It maintains several entrances to the yard at which are placed gates and signs, warning against trespassing on the premises. Its product is shipped out by rail and boat. Its shipments by boat are made over a dock on Little Bay de Noc, owned by the defendant. The boats which take out in part the product of the mills, are loaded by members of the Longshoremen's Union and not by employees of the defendant. To reach the dock which is north of and adjacent to the mill yard, it is necessary for the men occupied in loading boats to pass through the mill yard.

"A railroad track, which is connected with the Soo Line Railway, enters the defendant's yard through a gate, called the 'switch gate,' in the fence on the south boundary of the yard. While this track is laid on a reverse curve, its general direction from the switch gate to its terminus in the yard near the dock is northwest. Also connected with the Soo Line Railway is another short spur track which enters the yard at the switch gate. Connected with the main yard track is another track which runs northerly and also terminates in the yard. It is with the main yard track, or rather with a path said to run near to and westerly of it, we are principally concerned.

"Through a gate, known as the main gate, in the fence on the south boundary of the yard and west of the switch gate, a road which connects with the streets of Gladstone, enters the yard and extending northerly, crosses the main yard track. After crossing the track, the road continues on in a northerly direction to a point, when it turns west and runs to or near the upper end of the main yard track. From a point on

the graveled road, about midway between its intersection with the railway track and the main gate, another road (called the barn road, from the circumstance that it passes between two barns), extends northerly to the dock. The first of these roads is graded and graveled. The second is graded but not graveled. Both are suitable for use and in daily use by pedestrians and vehicles.

"No attempt is made to state exactly the location, course and distance of these tracks and roads, or their location relative to each other. To an understanding of the question presented, that will be unnecessary. It will be sufficient to state that the roads mentioned are the ways constructed and maintained by the defendant for all persons engaged in loading or unloading boats, or otherwise having occasion to go to or from the docks; and that proceeding on either the gravel or the barn road, one is absolutely safe from any and all dangers arising in the loading or unloading of cars on, or in any other use of the main yard, or of any of the tracks mentioned, except at the point where the gravel road crosses the track and with that point we are not here concerned. It further appears that for a person residing in the east end of Gladstone where the defendant [decedent] resided, the distance to be traveled in going to or returning from the dock is materially shorter by way of the switch gate and main yard track, than by way of the main gate and from thence by the gravel or barn road.

"The defendant's servants loaded a flat car with green hemlock plank, twenty feet long, six inches wide and two inches thick. The car was then delivered to the Soo Line for transportation and delivery at a point on the Michigan Central railway. The car was loaded in conformity with the loading rules of the Soo Line and other roads as well, but the Soo Line inspector thought the load needed adjustment to be acceptable to the Michigan Central railway, and returned it to the defendant for such readjustment. A part of the lumber was loaded further towards one end of the car than the remainder and while the inspector found no danger of the load breaking out sideways, he thought a part of it might slip further towards the end.

"The main yard track, as has been said, is laid on a reverse curve. At some points on the track, the

curve is more acute than at others. The outer rail on these curves is raised somewhat higher, varying according to the degree of the curve, than the inner rail, which conforms, however, to the usual and necessary practice in railroad construction and operation.

"When the car was returned, it was spotted on a curve, the outer rail of which was 2½ inches higher than the inner rail. As a result, one side of the car was 2½ inches higher than the other. Assuming the height of the car to be four feet and of the load to be ten feet above the car, which is approximately correct, the elevation of one side of the car 2½ inches above the other, brought the center of the load at the top, between eleven and twelve inches west of the center of the track and towards the path in question, which was on the west side of the car.

"Although on a load of lumber of the size, kind and quality on this car, but three stakes are required by the loading rules of the railroads, when the car was originally loaded and sent out and when it was returned, it was equipped with four stakes on each side. These stakes were set in an iron bracket or pocket on the car and at the top each stake was wired across the load to the stake on the opposite side.

"The car being returned and standing on the track, a foreman of the defendant directed two of its servants, Sullivan and Spencer, to take out the old and put in new and larger stakes and to take off the lumber and re-load so as to make the ends square from the floor of the car up.

"To receive the lumber as it was removed from the car, the defendant's servants brought up and located on the west side of the car, a wagon, which had a platform from five and one-half to six feet wide, they removed the wires which bound the stakes across the top of the load, took out the old four and installed three new stakes and proceeded to unload; Sullivan on the car removing the lumber, and Spencer on the wagon receiving it. 'We got off part of the load,' Sullivan said, 'maybe fifteen or twenty pieces of lumber, somewhere along there; and I was stooping down to pick up another piece. I saw the load commence to come apart and I hollered and jumped off on the opposite side of the car, and the man on the wagon jumped

off and the load went over to the west, breaking all three stakes on that side of the car.'

"At this time, a boat lay at the dock to take out a cargo of lumber from the defendant's mill.

"The plaintiff's intestate was a member of the Longshoremen's Union and he with other members of the union was employed, as there was occasion, in loading and unloading boats which landed at Masonville, Wells, Rapid River and at Gladstone docks, including the defendant's dock. On the day of the accident, he entered the defendant's yard at the switch gate and walked along the west side of the main yard track to the dock, where he arranged for the loading of the boat by members of his union, and returning over the same route to notify the members of his union the boat was ready for its load, he stopped and engaged in conversation with the men or one of them, engaged in unloading the car. While he stood there on the west side of the wagon, the accident happened. He was hit by the lumber, or by one of the broken stakes, and injured so that he shortly died.

"The mills of the defendant have been in operation over fifteen years. Made no doubt by the workmen of the defendant passing back and forth about the loading and unloading of the cars and other affairs of the plant, by the railroad employees in the switching of cars and by others who walked that way, there is a well marked path commencing a short distance from the switch gate and running on the west side and within four feet of the west rail of the main yard track to the turn-off to the dock, except that opposite the foreman's office, near which the accident happened, the path is from fifteen to seventeen feet west of the track.

"The average number of boats loaded at the defendant's dock in each season of navigation, is not definitely fixed by the testimony. The only testimony on the subject is that of the plaintiff's witness, Bedard, who said they had four or five boats last summer, that he believed in 'some' summers they have had more than ten and added there was occasion to be on the defendant's grounds 'only once in a while.' Respecting the average number of men required in the loading of a boat, or how many hours or days were required in such loading, the testimony is silent.

"How often or in what numbers therefore does not appear, but it does appear definitely that as there was occasion, some of the longshoremen went to and from the dock by way of the main entrance and the gravel or barn road, and others by way of the switch gate and the path alongside the railroad track; and it further appears definitely that in going to and from the dock during a period of about fifteen years, the decedent, not always, but generally walked on the path and through the switch gate.

"With the exception of some of the longshoremen, it does not appear that other persons having business at the dock, or with the boats, or the employees of the boats, or any person or persons whosoever, other than the employees of the defendant and of the railroad company, and according to one witness, an occasional child carrying a lunch to its father, ever used the switch gate entrance or the path, and they, the longshoremen, did not, of course, enter the yard during the winter months, and as it may be inferred, but infrequently during the season of navigation. The testimony will support the further inference that to the extent longshoremen used the switch gate entrance and the path as a way to and from the dock, the defendant's agents in charge of the plant on the ground, had knowledge.

"At the close of the proofs, the defendant moved for a directed verdict in its favor on the ground that there was no evidence of the violation of any duty, the defendant owed the decedent; that the deceased had not been invited to the place of the accident, was not there on any business connected with the defendant, but for his own convenience; that he was a trespasser; and if not he was at most a licensee to whom the defendant owed no duty other than to refrain from doing him wilful injury; and that in any event, he was guilty of contributory negligence such as would bar a recovery. The verdict was directed on the ground, so far as it was announced at the time, that there was no evidence tending to show the decedent an invitee; that giving the case the most favorable aspect the plaintiff could claim for it, his decedent was a licensee to whom the defendant owed no duty except not to wilfully injure him, of a violation of

which duty there was no evidence. The case is now before the court on a motion for a new trial on the ground stated in various ways, that the court erred in directing the verdict. The question now is not whether the reason stated by the court at the time was sufficient reason for directing the verdict, but whether, on a review of the whole case, the result was or was not correct.

"From Gladstone or elsewhere, there was no road, street or alley leading to the switch gate. To enter the yard through that gate, it was necessary to cross the Soo Line yards and walk on the Soo Line track to its connection with the defendant's track at the switch gate. Passing through the switch gate and, at least for a short distance beyond, it was the practice, if not necessary, to walk on the tracks. The tracks in the yard and the space occupied by the so-called path, was necessarily and plainly devoted to the business of loading, unloading and the switching of cars. That in the loading and unloading of cars, carrying heavy and bulky material, and in their movement about the tracks by the switch engines, accidents were likely to happen to the injury of persons in the pathway, was plainly evident to everyone. To warn an experienced longshoreman the path was a place of danger, nothing further than his observation of the uses to which the track was put was necessary.

"To accommodate the purposes of the defendant for which the track was constructed, and in which it was in constant use, it was impossible to fence the longshoremen out and it was equally impossible to set aside as a way for them the space occupied by the path. That space was in daily use by the servants of the defendant in loading and unloading and by the servants of the railway company in switching cars.

"It must have been equally evident to the longshoreman from his observation of the activities of the defendant on and in the vicinity of the track and path, and from the general surroundings that the defendant neither assented to, or acquiesced in the use of the path as a way for anyone other than its own servants and the servants of the railway in the orderly and usual conduct of its affairs. It posted generously and conspicuously warnings against trespassing. It

graded, graveled, planked and maintained one road; it graded and maintained another and much shorter road, which were known to be the ways provided by it for persons going through its yard to the docks; it commonly brought directly to the notice of the longshoremen that the path was not set aside as a way for him, by blocking it with its loading wagons; and it was so blocked at the time of the accident as plainly appears by the photographs, Exhibits D and N, introduced by the plaintiff to show the location of the car and wagon and the surroundings at the time of the accident. Before the deceased reached the car, his observations must have taught him that for that occasion, at least, his license, if he had any, to proceed on the path, was withdrawn and had he then turned out to the barn road, which was nearby, he would not have been hurt.

"To facilitate, no doubt, the rapid movement of engines and cars in and out of the yard, it appears to have been the practice, generally, to leave the switch gate open. That was a reasonable practice. The object of leaving the gate open must have been apparent to all persons acquainted with the business there carried on and the manner in which it was carried on. That the switch gate was commonly left open may not be seized upon as evidence tending to show an invitation to use it, or of acquiescence in its use, as an entrance by persons on foot.

"The distance to be covered in going to or returning from the dock by way of the switch gate and path, by persons living in the east end of the town, is much shorter than by way of the main entrance and the gravel or barn road. For that reason and that reason alone, the decedent and other longshoremen who lived at the east end, commonly went and returned by way of the switch gate and path. Without exception, every witness who testified on the subject, said he went that way because it was shorter.

"In this case, as in *Winnie* v. *Railway Co.*, 160 Mich. 334, it is impossible to conceive how the defendant could have more effectively warned—a man of mature years, with more than fifteen years' experience as a longshoreman, that the path in question was a place of danger, that he was warned by his observation of the uses to which it and the track adjoining

it were put; and what is said in *Clark* v. *Railroad Co.*, 113 Mich. 24 (67 Am. St. Rep. 442), may be said of this case, that there is no evidence indicating an invitation or license, unless it be found in the fact that the defendant has taken no steps to prevent the longshoremen from walking in the path.

"Plaintiff's counsel have cited a number of cases, involving injury to children, and to adults on depot ground and in other public or *quasi*-public places. Those cases are readily distinguishable from this. The facts of this case bring it within the doctrine of *Winnie* v. *Railway Co.*, *supra; Clark* v. *Railroad Co.*, *supra;* and *Risbridger* v. *Railroad Co.*, 188 Mich. 672.

"The decedent was invited or at least licensed by the defendant to pass through its yard on his way to and from the dock, but such invitation or license was limited to the ways provided by the defendant and the decedent could not, therefore, without the risk of being held to be a trespasser, proceed outside the limits of his invitation or license. *Hutchinson* v. *Cleveland-Cliffs Iron Co.*, 141 Mich. 346; *Woods* v. *White Star Line*, 160 Mich. 540 (27 L. R. A. [N. S.] 992).

"The fact that the decedent was engaged at the time in an occupation advantageous to the defendant did not serve to enlarge his privilege. The rule which classifies as a trespasser one who goes beyond his invitation or license, extends to employees of the proprietor and to the employees of others engaged at the time in a business or occupation advantageous to the proprietor, as well as to other persons. *Hutchinson* v. *Cleveland-Cliffs Iron Co.*, *supra*, and see *Winnie* v. *Railway Co.* and *Risbridger* v. *Railroad Co.*, *supra*, where the persons injured were employees of the defendants and entitled as such to enter upon the premises, but not over the ways they attempted.

"The plaintiff introduced on the trial a writing whereby the existence of certain facts was stipulated and agreed by counsel for the respective parties, among them that the decedent returning from the dock for the purpose of notifying other members of his union the boat was ready for loading:

" 'Passed through the yard of the said defendant company and stood by the carload of lumber which had been returned as

hereinbefore set forth, and engaged in conversation with the men who were readjusting said load. Within a short time, not exceeding two minutes after he arrived at the car, the stakes on said car broke near the lower end, one of which fell and struck the said Joseph Desrochers upon the head, resulting in his death within a short time thereafter.'

"For the purpose of showing the length of time the decedent stood at the place of the accident before the lumber fell, the witnesses were interrogated. Sullivan, who was on the car, said the decedent 'hollered up' to him, 'passing the time of day' and then 'he started to talk with the fellow on the wagon' and continued standing there at least two minutes before the accident. Another witness, Boulme, called by the plaintiff, who was working on a platform 'back of the planer' about seventy-five feet away from the place of the accident, estimated the time that elapsed after the deceased passed around the end of the car and before the lumber fell, at half a minute. Spencer, who was on the wagon, for reasons not explained, was not called by either side.

"The facts are settled as well by the testimony of the witnesses as by the written stipulation of the parties, *first*, that the decedent stopped, *second*, that he engaged in conversation with the defendant's servants or one of them, and *third*, that while he stood there, and not while he was walking in the path, the accident happened.

"If evidence may be found in this case, tending to show the decedent was licensed to walk in the path, it is certain no evidence will be found tending to show the deceased was licensed to make use of the path or other land beside the railway for the transaction of his business or social affairs with the servants of the defendant. There is no evidence that at any other time the decedent made use of the premises for that purpose and there is no evidence that any other member of the Longshoremen's Union, or other person or persons, made use of the premises for such purpose, or for any purpose other than to walk to and from the dock. It will be superfluous to add the defendant cannot be held to have consented to or acquiesced in, a use of its premises to which, so far as the testimony informs us, it had never been put pre-

vious to the moment of the accident. To hold the defendant to have impliedly granted the decedent a license to enter its premises and there stop, visit and transact his social or business affairs with its servants, that practice must appear to have been indulged in openly and for some time; when the practice is not shown to have been indulged the claim of an implied license to follow it is wholly without foundation.

"No doubt, cases have arisen where the license was found to be more or less elastic in scope, where its edges were not definitely marked. In such cases, the question commonly is whether the licensee was within the limits of his license. Here the entire evidence directed to the proof of a license, limited the privilege, if any was granted, to the switch gate entrance and not to spaces on either side of the path, but strictly to the path, and even more strictly, to walking on the path. Where, as in this case, the limit and scope of the alleged license is definitely fixed, the question is not how far outside the limits of his license the licensee has gone measured by feet and inches, or by hours or minutes or fractions thereof, but whether he was outside or inside those limits. If the decedent was licensed to walk in the path, the utmost of the duty towards him, the defendant owed, was to see that without reasonable notice to him, the path was not rendered more dangerous to walk in. It certainly did not owe the decedent the duty to see the lumber did not fall while he stood there visiting with its servants. Whether his pause beside the car was two minutes, one-half minute or even less, had he instead exercised the sole privilege, it is possible under the evidence to claim was his, viz., to walk in the path, and had gone on about his affairs, he would not have been injured. Assuming the decedent was licensed to walk in the path, he had the option to continue under the protection of his license or to stop and become a trespasser. Having elected to stop, his administrator should not be heard to complain if his decedent is held to the consequence of his voluntary choice. *Kinney* v. *Onsted,* 113 Mich. 96 (38 L. R. A. 665); 29 Cyc. p. 456.

"The negligence of the defendant claimed on the trial as well as on this motion was: In attempting to

readjust the load with the car standing in a curve, one side of which was higher than the other; and in the use of unsound stakes and insufficient stakes, wherefore the path was rendered more dangerous without notice thereof to the decedent.

"It is not claimed the track was improperly constructed; or that the lumber was not being unloaded in the usual and customary way, or was being unloaded in an improper way, but at an improper place. It will be conceded the defendant as against the decedent, assuming he was a licensee, had the right to unload and reload its car in the usual and customary way of doing that work, and for that purpose to spot the car at any point on its track, even though the place happened to be a curve, the outside rail of which was higher than the inside. To admit the plaintiff's contention that the place of unloading was objectionable because one rail was higher than the other would be to hold the defendant prohibited from using any part of the track for that purpose. The entire track was on a curve. It would have been difficult, it may be presumed, to have found a spot on it where one rail was not, to some extent, higher than the other. The defendant was under no obligation to depart from its usual and customary method of conducting its business for the better protection of a licensee. Nor is the installation of three instead of four stakes, or the size of the stakes, any evidence of negligence. It is uncontradicted that on a load of lumber of the size and character of the load in question but three stakes, which may be three by four or four by five inches in size, is required by the loading rules of the railroads; nor is it claimed these stakes should have been wired across the top to the stake on the opposite side, while the lumber was being unloaded; nor is the manner in which the defendant's servants handled the lumber in his effort to unload it questioned.

"That it is considered necessary or is the custom or practice to maintain stakes on the side of the car while unloading lumber therefrom, to prevent the lumber from spreading and falling off whether the car is standing on a sharp curve or not, was not shown. If, notwithstanding the silence of the evidence on that subject, the necessity for such stakes must be pre-

sumed, then the sole act of the defendant's servants in connection with the readjustment of the load, which is fairly open to investigation respects their use of unsound stakes. One of the stakes was sound, another when broken showed slight dry rot and cross-grain but when whole would appear to be 'a pretty good stake.' The third shows dry rot at the place where it broke, which was at or near where it rested in the car bracket.

"These stakes were selected and inserted by the witness, Sullivan. He knew one was sound. He had a right to believe the second was sound because until broken, it did not show its infirmity. He knew the third showed dry rot at or near the place it entered the car bracket. He did not appreciate, however, that the stakes were necessary to prevent the load falling over, because, as he said, the load exerted no pressure on the stakes he took out, or on the stakes he put in. He knew as every man of common sense and experience would know, that if the load, consisting of green and heavy hemlock planks, suddenly fell over against the stakes while unwired at the top, they would break and let the lumber to the ground, whether the stakes were sound or unsound. So plainly, to know the condition of the stakes rendered the path more dangerous to persons rightfully walking or standing in it, the servants of the defendant must have known and appreciated the load was likely to spread and fall. They knew the lumber was not lapped and they knew the top of the load leaned towards the path some eleven or twelve inches from the perpendicular. But one of them placed himself on the load in a place of danger if the load fell, which he would not have done, and the other continued on the wagon in a place of greater danger which he would not have done, did they know and appreciate the load was likely to fall. That it is the practice to lap lumber when loaded on railroad cars, or that this lumber was improperly loaded because not lapped, nobody said and nobody claims. On the contrary, that it is common and proper to so load appears from the fact that this car was held to be properly loaded according to the loading rules of the Soo and other railroads. If there was anything in the appearance of the load other than that the car

listed 2½ inches on one side more than the other, to charge the servants of the defendant with knowledge it was likely to spread and fall, it has not been pointed out. If the question had been submitted to them, the jury might have found, and had they done so, there was, we will say, sufficient evidence to support the finding, that because of the condition of the stakes and that the listing of the car, the defendant's servants should have known, but they would not be warranted in finding they certainly did know and appreciate the lumber would or was likely to fall.

"It has often been held in this State that the duty which the proprietor owes to one rightfully on his premises under a license, express or implied, is to refrain from knowingly, wilfully or wantonly injuring him. This rule, it is said, has been modified by *Morrison* v. *Carpenter*, 179 Mich. 207 (Ann. Cas. 1915D, 319). That was a case where a dangerous opening was made across the way over which the person injured had a license to travel, without notice thereof to him. The opening across the way of that case was from 16 to 17 feet long, seven or eight feet wide and from 23 to 25 feet deep. A case more plainly showing the rendition of a way more dangerous by the act of the proprietor, or of those acting through or under it, knowingly and wilfully committed, would be exceedingly difficult to find. The rule which, to entitle him to recover, obligates a licensee, to show an injury as the result of some wilful negligence of his licensor was not departed from in that case. The doctrine of that case is summed up in these words:

"'We think the rule may be stated that, after granting license to use the premises, the owner cannot lawfully, by his affirmative action, change the premises so as to make them more dangerous without notifying the licensee of that fact, or warning him of the added danger.'

"Affirmative action means action with consciousness that the thing which the proprietor is about to do, will, or at least is calculated to, render the way more dangerous.

"The rule contended for by the plaintiff not only would make the defendant liable for the act of its servants in knowingly and with full appreciation of its probable consequences to a licensee without notice

DUBE v. COOPERAGE & LUMBER CO. 675

thereof, placing a dangerous obstruction in a way, or digging a trench across it or placing a thing in the vicinity of the way with appreciation that it will, or may fall and injure persons rightfully thereon, but also for any act committed or omitted by the servant, which unexpectedly turns out to render the way more dangerous, but which did not appeal to his experience and judgment as at all likely to do so, provided a jury can be found to say his judgment, although in the best of good faith and good intentions exercised, was under that of the average person of ordinary intelligence and prudence; and such rule would have the further effect, practically in action in their behalf founded on any negligence to remove all distinction between licensees, invitees and persons traveling the highways. (Whether that is an end devoutly to be wished or not, we have not yet arrived at it in Michigan.)

"The motion to direct the verdict, having been properly granted as it is thought, the motion for a new trial is denied."

Plaintiff now reviews the case in this court under nine assignments of error which, however, may be treated together as they all go to the propriety of the court's action in directing a verdict for defendant. Plaintiff's counsel devote some 21 pages of their brief to a somewhat vitriolic criticism of the judge's opinion. They say:

"We seriously challenge nearly all of the statements contained in this statement by the trial judge."

Other assertions follow, much less temperate, and in the orderly administration of the law, scarcely to be excused. These unusual assertions by counsel have led us to examine the testimony with more than ordinary care and to compare it with the opinion of the trial court for the purpose of determining whether the criticism of counsel for plaintiff may be said to be in any degree justified. While it is true that in stating the facts, the learned circuit judge used his own language, placing the matter testified to in nar-

rative form, we fail to find any such variation in *substance* as counsel claim exists. Verbal inaccuracies frequently appear, but had the court quoted the testimony of the witnesses *in hæc verba*, the conclusions to be based thereon would be identical with those logically based upon the statement as made.

It will be noted from an examination of the opinion that the learned trial judge treated plaintiff's decedent neither as a trespasser nor an invitee, but as a licensee. This holding is criticized by counsel for appellant, who assert that although plaintiff's decedent was not an employee of defendant, his work in loading the boats with defendant's product was indirectly for defendant's interest and, therefore, under authority of 29 Cyc. p. 454, and cases cited, the relation of decedent to defendant was that of invitee. The exact distinction between a licensee and an invitee cannot readily, or, perhaps, always certainly, be made; but inasmuch as this court has quite recently held (*Peklenk* v. *Isle Royale Copper Co.*, 170 Mich. 299) that the owner of premises owed to a licensee the duty "to warn the tenants of any existing dangers known to them or discoverable in the exercise of reasonable care," it would seem unimportant, in the case at bar, to accurately define the status of plaintiff's decedent. Assuming, then, that the duty rested upon defendant to notify plaintiff's decedent of the changed conditions in the path and that defendant had actually invited decedent to use that path in going to and from the dock, where his duty called him, let us examine the situation. Of course, the existence of the truck in the center of the path by the side of the car was, in itself, an advertisement to decedent of a changed condition. No warning of that fact to decedent was necessary, nor could it have availed him more than the casual exercise of a sense of sight. By the same means, decedent was advised of the fact that the

heavily loaded car was standing upon a curve and was in the process of unloading.

What fact, then, known to defendant's agents and unknown to plaintiff's decedent, should the agents have communicated to him? Should they have advised him that the load was standing on the curve and that at any moment the outside tier of plank might drop over? The testimony negatives the fact that defendant's agents believed there was any such danger, for both of them were in places of much greater danger, in case of accident, than that occupied by decedent. Should they have known that such an accident was likely to occur, and, therefore, have warned decedent? The contrary appears to be conclusively established upon the record. Sullivan, defendant's agent, removed the stakes from the side of the load which fell and replaced them with new ones without difficulty, there being no lateral pressure upon them. We conclude, therefore, that there was no fact or circumstance contributing to decedent's injury in connection with the visible obstruction to the path, unknown to decedent, which was known or which, on the evidence, should have been known to defendant's agents.

This conclusion disposes of plaintiff's case under the most favorable view that can be taken of the testimony and renders unnecessary a discussion of the interesting question raised by the fact that decedent, in the use of the path, stopped for social or other purposes from thirty seconds to two minutes to visit with defendant's agents, instead of pursuing his way in safety.

This highly regrettable accident is one which, in our opinion, entails no legal liability upon defendant.

The judgment is affirmed.

MOORE, C. J., and STEERE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.