RISBRIDGER *v.* MICHIGAN CENTRAL RAILROAD CO.

1. Railroads — Personal Injuries — Master and Servant — Licensees.

Decedent was an employee of the defendant railroad company. He was accustomed in going to his work to travel along the right of way of defendant, a route which the public was accustomed to follow. Other servants of the company likewise made use of the tracks as a path to and from its shops. A freight train of the railroad company passing at this point about 5 o'clock in the morning, when it was dark and foggy, with the engine backing at the forward end, the tender in front, and having no light displayed, ran down decedent, who was not seen by any of defendant's employees and who was fatally injured. *Held*, on rehearing, that in operating trains over a part of the right of way which was used by employees as a footpath, defendant was under no legal obligation to display lights and to sound the statutory signals for a crossing.

2. Same—Yard Limits—Trespasser—Duty to Warn.

*Held*, that the additional fact, not adverted to in the first, or original, holding in this case, that plaintiff's intestate was inside the cattle guard situated at the crossing and was within the yard limit of defendant railroad company, furnished further reason for denying any right of recovery to the estate.

3. Same—Yards—Obligation.

It being impracticable to prevent trespassing upon railroad tracks enclosed by a cattle guard, a trespasser takes the risk of any resulting injury; the company owes no more strict duty than not to wilfully or wantonly kill or injure him.

4. Same—License.

And even if decedent should be considered a licensee upon the right of way, he had no ground or right to expect that the corporation would forego its reasonable and ordinary use of the tracks.

[1]Generally as to duty of railroad company to keep lookout for trespassers on tracks, see notes in 25 L. R. A. 289; 8 L. R. A. (N. S.) 1069, 1076; 41 L. R. A. (N. S.) 264; particularly as to speed, 11 L. R. A. (N. S.) 352.

Error to Jackson; Parkinson, J. Submitted May 1, 1914. (Docket No. 24.) Decided April 19, 1915. Rehearing granted. Resubmitted January 19, 1916. Original opinion reversed and judgment affirmed March 30, 1916. Rehearing denied September 27, 1916.

Case by Ada E. Risbridger, administratrix of the estate of Chauncy E. Risbridger, deceased, against the Michigan Central Railroad Company for the unlawful killing of plaintiff's decedent. Judgment for defendant upon a directed verdict. Plaintiff ₀brings error. Affirmed.

*Price & Whiting,* for appellant.

*Wilson & Cobb* (*Henry Russel* and *Frank E. Robson,* of counsel), for appellee.

McALVAY, J. Plaintiff, as administratrix, brought suit against defendant to recover damages on account of injuries to her husband which resulted in death, claimed to have been caused by the negligence of defendant. Upon the trial, when plaintiff rested her case, the court, upon a motion to that effect made by defendant's counsel, directed a verdict in favor of defendant and against the plaintiff, upon which a judgment in due form was duly entered. Plaintiff brings error.

The material assignments of error necessary to be considered relate to the action of the trial court in directing a verdict for defendant. In reviewing a judgment on a verdict directed for defendant, this court considers the testimony in the light most favorable to the plaintiff. The case made by plaintiff tended to show the following facts:

The injury occurred in the city of Jackson, where at the time plaintiff's decedent was an employee of

188 Mich.—43.

defendant, and had been so engaged for a week and a half as a car repairer in its junction shops in said city. The plaintiff's decedent, with his family, lived on High street, in the southwest part of the city. The junction shops were located northeasterly from said street at a distance of more than one mile, and between High street and the shops the right of way and tracks of defendant's railroad extend continuously. At these shops defendant employed a large force of men. Many of these workmen, who lived in the southwestern part of the city, had been in the habit for many years of going to their work in the morning and returning at night along defendant's track. It was a good smooth footpath all the way, and where it crossed the river the bridge was covered over solid.

Plaintiff's decedent, also, during the time of his employment, went to and from his work along these tracks of the company, having been accompanied the first two mornings by an old employee of defendant, who was his next neighbor. Many people not in defendant's employment also frequented these tracks, going back and forth along them on foot. Such use of these tracks by workmen and others was well known by the employees of the company and the crew of the train which struck and killed Mr. Risbridger. The deceased was 53 years of age, in good health, and of good habits. He had no experience in railroad work prior to this employment. This accident occurred between 5 and 6 o'clock in the morning of November 16, 1910, when the deceased and others of defendant's employees at the junction shops were on their way to their work walking along these tracks.

There were no eyewitnesses to the accident. Decedent's body was found along defendant's right of way about 75 feet northeasterly from Belden street. He had left the house to go to his work about 5 o'clock that morning, which was dark and foggy, and had

arrived at the place where he was killed before day-light. On that morning a gravel train, consisting of a very powerful locomotive and tender, 75 empty flat cars, and a caboose, of a total length of more than 3,000 feet, started from the Junction to go to Colon, a distance of 55 miles, on the Air Line Division of defendant's road. The engine which pulled this train was backing up with the tender piled high with coal. Proceeding westerly in this manner, the back end of the tender was the front end of the train.

It is admitted that there was no headlight upon the back end of this tender as it proceeded. On the part of plaintiff, testimony was introduced tending to show that there was no light of any kind upon the rear end of the tender, and that this engine did not whistle or ring its bell. The crew of this train consisted of a conductor, who was riding in the engine on the fire-man's side, the engineer and fireman, who were also in the locomotive cab, the head brakeman, who was stationed on top of the coal on the tender for the pur-pose of exchanging signals with the rear brakeman by means of his lantern, and to know that the train was all right, and the second brakeman, who was back toward the rear of the train.

There are two tracks on this right of way, running parallel with each other, which are used as double tracks. The south track belonged to the Lake Shore & Michigan Southern Railway Company, and the north track, being the one upon which Risbridger was claimed to have been killed, belonged to the defendant. In the operation of the road all trains moving to the east take the south track, and all trains moving to the west take the north track. Deceased was found while it was still dark by Alfred De Fresna, a switchman in defendant's employ, on his way to work. He was lying with his head near the south rail of the west-bound track, his legs extending diagonally towards the east

track. His hat and dinner pail were on the ground near him. One foot was cut off between the knee and the ankle, entirely separated. Another man named Kimball, also employed by defendant, arrived at this place about the same time. These men undertook to do something for deceased and found that he was still alive. He revived when moved slightly, and said only a few words about being cold and wanting his hat, and then expired. De Fresna, as soon as he arrived there, ran to the signal tower, which was about a block northeasterly from the place where the body was found, for the purpose of having the towerman telephone for an ambulance, which he did, and the ambulance arrived soon after.

None of the crew of this gravel train saw any one on the track that morning, or knew that the train had struck a man, until they arrived at Colon, their destination, when the conductor received such information by telegram from the superintendent. There was testimony in the case presented by plaintiff tending to show that there was considerable blood found on the forenoon of the day on which the accident occurred on the ties and south rail of the defendant's track at the place where the accident occurred. It also appears without dispute that, at the same time this gravel train going west passed the place where the accident occurred, a freight train passed going east toward Jackson on the south track.

There is no dispute in this record but that along these tracks the entire distance down through this railway yard the employees of defendant and all persons who desired had for many years used these tracks on their way to their work in defendant's junction shops, or wherever they might be going, as a footpath, and this was well known to the employees of defendant who operated trains over the tracks.

The errors assigned by appellant which we will con-

sider relate to the charge of the court as given to the jury in granting defendant's motion to direct a verdict, which was to the effect that defendant owed no duty toward plaintiff's decedent, because he was a trespasser walking along the tracks of defendant's road; that he assumed all risks in using such tracks as a way to walk upon for his own convenience or purposes, his being upon the track not having been discovered at the time by the employees of defendant. Taking this case made by plaintiff as epitomized, it must be admitted that such a case was presented as entitled plaintiff to have it submitted to the jury, unless, taking the facts as true, we find that no recovery could be had by reason of some well-settled rule of law.

We find from the facts stated that for many years the employees of defendant, the employees of others along this track, and citizens had used these tracks as a footpath going to and from their work, or for their personal convenience. The record is clear that this was known to defendant's employees. The crew who operated the gravel train in question were acquainted with the fact that such a custom existed. It follows that defendant company must be charged with knowledge of such a custom. This custom had grown up in a thickly populated city of considerable size. These tracks had become a footpath for the general public, which use had continued for years with the knowledge of defendant, without even posting notices prohibiting it. The inference follows that it consented to such use.

Under these circumstances, it would seem that there should rest upon defendant some duty, at least of reasonable care, owed by it toward these people whom it had permitted to make such use of its tracks. When this accident occurred, defendant must be held to have expected that the tracks were being used, as they had been used for years, by individuals on their way to

work, or about their business. It would seem that the law should impose a duty upon defendant to use reasonable care in operating trains along these tracks in the darkness on that morning, where it would be reasonably expected persons were using them for a footpath. The rule laid down by the trial court is that plaintiff's decedent on these tracks, being a trespasser, must take his chances; that defendant owed him no duty of care whatever. Admitting that such a rule is applicable in some cases, under the circumstances of this case it appears, to say the least, to be extremely harsh.

It is admitted that there was no headlight on this train. There is testimony tending to show that there was no light of any kind upon the rear of this tender, which was the front end of the train. There was no lookout, and, had there been one, there was not sufficient light to show the tracks ahead of the train. There is also evidence tending to show that no whistle was blown or bell rung. It is contended by defendant that the evidence shows there was an ordinary hand lantern on the end of the tender and that the whistle was sounded and the bell rung. These were questions of fact for the jury, if material. The speed of the train was from 9 to 15 miles an hour. The city ordinance prohibited a greater speed than 6 miles an hour.

The exact question involved in the instant case is one of first intention in this court. We find, however, that there are authorities which hold that, under facts similar to those presented here, persons so using the track of a railroad company as a footpath are regarded as licensees, and that trains at such places must be operated with this knowledge in mind, which calls for the exercise of reasonable care. We quote from an accepted authority as follows:

"As a general rule, the fact that a railroad company allows the public to pass constantly on or over its

tracks with knowledge of the custom warrants the inference that it consents to the use, so that a person so using the track is regarded as a licensee, and trains must be operated with this knowledge in mind, and this calls for the maintenance of a lookout, the giving of timely warning, and the keeping of the engine under proper control. The care demanded in this situation is reasonable care. The test is whether there has been such use of the track as a footpath as to support reasonable grounds to the operatives of the train upon such a track to anticipate the presence of persons on or so near the railroad track as to endanger them. And for the purpose of this rule it makes no difference that the railroad company has posted signboards warning people not to trespass on the right of way. The rule requires engines to be operated at such places with lighted headlights at night." White's Supplement to Thompson on Negligence, vol. 8, § 1725, and cases cited.

In our opinion, the rule laid down by the foregoing authority is a reasonable one, and it cannot be considered as a departure from the former decisions of this court. It is but an application of the principle frequently applied that from acquiescence in a course of conduct for an extended time duties and obligations arise. To hold in the instant case that the years of acquiescence upon the part of defendant to the use of its tracks in the manner stated created no duty of a reasonable care on the part of defendant toward these licensees would be contrary to both reason and authority. Our conclusion is that the trial court was in error in directing a verdict for defendant.

The judgment of the circuit court is reversed, and a new trial ordered.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.

## ON REHEARING.

BROOKE, J. Counsel for appellee criticise the statement of fact contained in our former opinion in this

case. Certain inaccuracies and omissions do appear, which, though not controlling, may be noted as follows: The speed of the train, instead of being from 9 to 15 miles, was not to exceed 10 miles an hour. The only evidence to the contrary was given by the witness Snyder, who said:

"Well, now, I ain't a very good judge of trains, but I should think it was running close to 15 miles an hour."

Upon cross-examination he testified:

"I don't claim to be able to judge the speed of trains; have had no such experience in railroading as to enable me to judge on that. I don't claim my judgment on that subject is reliable."

As to whether or not the forward end of the train, which was the tender of the engine, was protected by a light, the record discloses that two witnesses, whose duty it was to see that an ordinary white light (railroad lantern) was in place upon the tender while backing, gave positive testimony to the effect that the light was burning at the beginning of the trip at the Junction, and that it was burning brightly at the first stop some four miles west. The witness Snyder testified repeatedly that no light of any kind appeared upon the train. Upon cross-examination, however, he gave the following testimony:

"Q. I am talking about on the outside of the train.
"A. I didn't see any.
"Q. I know you didn't see any; I want to know if you will say positively under oath that there were none?
"A. I would say I didn't see any.
"Q. Of course you would. Would you say positively they were not there?
"A. No; they might have been there. I didn't see any."

Two witnesses swore positively to the blowing of

the whistle at the crossings and to the constant ringing of the automatic bell. The witness Snyder testified as follows:

"I heard no whistle on that train, and no bell; even after I got out on one side, I didn't hear any bell ringing."

. In our former opinion it was said that there was no lookout. Plaintiff's witness Platt (examined under the statute) testified that he got up on top of the tank near its forward end with his lantern. He said:

"I went up on the tank in the performance of my duties that morning. I got up there to ride my train over the interlocker—to watch for your train, see everything is all right, the signals are all right, go up there as a lookout. * * *

"Q. You weren't watching ahead that night for anything on the track?

"A. If there had been anybody on the track ahead of me, that is, within range of a lantern we had set up there—I covered this territory where this man was struck or was supposed to be hit by our train—I would have seen him. * * * I naturally was looking ahead."

This witness further testified that he continued in this position until he passed the Belden road, which would carry him beyond the point where plaintiff's decedent was killed. The record contains no evidence tending to show that defendant's railroad track was graded or ballasted in any other manner than was necessary for its proper maintenance; or, in other words, there is nothing in the record to indicate that the defendant maintained its track "as a good smooth footpath" at the point in question, unless the same could be said of any similar piece of track in the State.

In our former opinion it was stated that "the custom had grown up in a thickly populated city of comparative size." While it is true that the city of Jackson is a city of considerable size, and in some portions thereof is thickly populated, the accident happened

in the southwestern suburbs of the city, where the population is comparatively sparse. A further fact, not stated in our original opinion, is, we think, important. From the point where plaintiff's decedent presumably entered upon the railroad tracks to the point where he met his death he crossed four streets. At each street intersection, the right of way being occupied by two distinct companies, there were two warning signs stationed. Upon the defendant's tracks likewise at each of said crossings there were placed ordinary cattle guards, some made of wood and some of metal. While the record shows that at times, at one or another of these various crossings, the cattle guards were taken up by the defendant company for its own purpose, there is no evidence contained in the record tending to show that on the morning plaintiff's decedent met his death any of the cattle guards were out of place. A further important fact not alluded to was that plaintiff's decedent was killed at a point well within the yard limits of the defendant company at a point where switching operations were of frequent occurrence.

The conclusion in our former opinion rested upon the assumption that the exact question presented was new in this State, and the case was therefore determined under the principle enunciated in volume 8, § 1725, White's Supplement to Thompson on Negligence. No discussion of the Michigan cases bearing upon the question is contained in the opinion. It being asserted by counsel for appellee that by our former opinion several earlier decisions of the court have been overruled, it is necessary to carefully examine those cases. I am of the opinion that the exact question presented is not new in this State.

In *Sturgis* v. *Railway Co.*, 72 Mich. 619 (40 N. W. 914), the plaintiff was injured while walking along defendant's track near its station on her way to the main

street of the village of Durand, instead of going through the station to her point of destination by a slightly longer route. She alleged in her declaration that a custom had grown up, which had been in force seven years, to permit, allow, and compel the passengers to walk over the aforesaid course and ground to reach the highway in the village of Durand. This court, speaking through CAMPBELL, J., said:

"The only ground urged for plaintiff was that the railroad track was very generally used as a shorter cut from the village to the depot than was furnished by the regular road. So far as defendant's use of it is concerned, it was not shown to have differed in any way from that generally made of railroad tracks on railroad premises, and no other means of travel on it appeared than would be found on any such track. The company never took measures to light it, or to facilitate ingress and egress. The travel over it was just such as will be found anywhere along such tracks, which cannot be closed more effectually than by a cattle guard. It is impracticable to keep off trespassers from an open track, and all who go upon it do so on their own risk of such dangers as are incident directly to such use."

In the case of *Clark* v. *Railroad Co.*, 113 Mich. 24 (71 N. W. 327, 67 Am. St. Rep. 442), plaintiff was injured while crossing the unfenced station grounds of the defendant. The court there said:

"It is apparent that persons living upon that street west of Main street find the distance to the business portion of the town shorter by going in a direct line across the tracks than by taking the highway running northeast to Main street, and then south; and, the station grounds being unfenced, people are in the habit of walking upon and across them at will. There is no evidence indicating an invitation or license unless it be found in the fact that the defendant has taken no steps to prevent it. * * * Counsel for the plaintiff make the claim that the common practice of crossing the unfenced grounds of the defendant at this

point for over 20 years had established a public easement, but they cite no authority which sustains the contention. In our opinion the evidence does not create a suspicion of the existence of an easement. There is nothing that indicates a license even, unless it is to be inferred from the fact that the defendant did not care to contest the right of every person whose convenience might lead him to cross the premises. Technically, such people were trespassers; but it is not to the discredit of the defendant that it did not resort to violence or litigation to stop a practice that did it no harm. Whether these persons were trespassers or naked and gratuitous licensees (which last we do not mean to intimate) is unimportant. In neither case had they the right to expect the defendant to forego a reasonable use of its land, in which respect it stood on the same plane as a private person" (citing *O'Neil* v. *Railway Co.*, 101 Mich. 437 [59 N. W. 836]).

In the recent case of *Winnie* v. *Railway Co.*, 160 Mich. 334 (125 N. W. 351), plaintiff, an employee of defendant, was injured while crossing the tracks of defendant in its yards at a point where the railroad company maintained signs notifying the public that there was no thoroughfare, that trespassers are not allowed, and that the place was dangerous. Speaking through Justice MONTGOMERY, we there said:

"Notwithstanding this, people had, as the evidence showed, quite generally been passing over the tracks of the defendant from Treat street to Michigan street, but whether at the precise point at which plaintiff received the injury there was some doubt. But it would appear that tracks had been worn by people passing over these tracks frequently. * * *
"The case was submitted to the jury upon the two last named propositions; the circuit judge instructing the jury, in effect, that if the public had traveled over these tracks to such an extent that the defendant company knew or ought to have known of the custom, and had not stopped it, and had been accustomed to use lights and give warnings, the failure to use the lights and give the warning on this occasion would be a

breach of duty to the plaintiff, and he would be entitled to recover. * * *

"We think the case should not have been submitted to the jury upon the first question. It is difficult to conceive what more this company could have done to give warning to the general public that this was a place of danger. The evidence tended to show that a fence had been maintained which had been torn down from time to time. The yard was very plainly devoted to railroad tracks, in which cars and engines were frequently moving back and forth and were themselves a warning of danger, and, with the notices posted as they were, the public who saw fit to pass over these tracks did so with full knowledge of the danger. Except by stationing men at the highway along the track, it is impossible to conceive how the company could have more effectively warned the public that this territory was not a thoroughfare" (citing *Perego* v. *Railway Co.*, 158 Mich. 225 [122 N. W. 535]).

The general doctrine affecting the duty of railway companies to trespassers is set out in section 1705 of White's Supplement to volume 8 of Thompson on Negligence, as follows:

"*Railway Company Under no Obligation to Provide in Advance Against the Possibility of Injury to Trespassers.*—Except at public crossings and a few other places, the right of way of a railroad company is its exclusive property and it owes a trespasser no greater duty than any other owner of property would owe a trespasser under the same circumstances. The railroad company is not required to anticipate the presence of a trespasser on its track or property, and this rule applies to children as well as to grown persons. The railroad company owes no higher duty to a trespasser than not to wantonly or wilfully injure him. It is only required to exercise ordinary care after discovering his peril not to injure him. The railroad company owes no duty to such persons to employ competent operatives, nor to keep its tracks safe for pedestrians by the use of only sound ties. It is under no obligation to stop its trains at railroad junctions merely for the benefit of trespassers."

Following section 1705, and up to section 1725, the author discusses the question at large, citing authorities from nearly every jurisdiction in the United States. Section 1725, the one quoted in our former opinion, and upon which our decision was predicated, is supported by decisions from several of the Western and Southern States, but finds no support in the decisions of this court.

Assuming, for the purposes of this case, that the whistle was not blown and the bell was not rung, plaintiff's decedent is not within the class for whose benefit the statutory signals are required. In the case of *Lepard* v. *Railroad Co.*, 166 Mich. 373 (130 N. W. 668, 40 L. R. A. [N. S.] 1105), the authorities are carefully collected and commented upon by Mr. Justice STONE. He concludes his opinion with the following statement:

"The whole history of the legislation upon this subject shows that it has been for the benefit of the traveler upon the highway who is about to cross, is crossing, or has crossed the highway, and probably might be invoked by a passenger who was injured by reason of a collision caused through the neglect to give the signals required."

Further, assuming that the engine was being operated without lights, we find ourselves confronted with the decision of *Winnie* v. *Railway Co.*, *supra*, where the court charged that, if the defendant had been accustomed to use lights and give warning, the failure to use the lights and give the warning would be a breach of duty to the plaintiff, which would entitle him to recover. We there said:

"The case should not have been submitted to the jury upon [this] question."

The facts under which the injury occurred in the *Winnie Case* were, in my opinion, much more favorable to plaintiff's recovery than are those in the case

at bar. The only point more favorable to plaintiff in this case than in that is that in the case at bar there is no evidence that warning signs were posted from point to point at the street crossings ordering the public to keep off. This fact, however, cannot be considered of controlling significance, for, after all, the only purpose of the warning sign is to give notice to the trespasser of the peril he exposes himself to in his unlawful use of the railway tracks. If he receives that notice through other instrumentalities, he is as adequately warned as if he stopped and read a sign advising him of his danger. This court has frequently held that the existence of the railway tracks themselves must be regarded by one entering upon them as notice that he is going into a place of danger. But in the case at bar, in addition to the fact that plaintiff's decedent must have known he was traversing a right of way occupied by two parallel tracks within the switching grounds of the defendant company, the cattle guards which he could only cross in the half light of the early morning with more or less difficulty must have served as a further warning. The right of way of the defendant at the point where the injury occurred was fully fenced and protected by the statutory warning signs at the various crossings traversed by plaintiff's decedent before his injury. Even in some jurisdictions where trespassers are permitted to recover while traversing a railroad right of way longitudinally, such recovery is forbidden when the trespasser, or licensee, is injured within the yard limits. The reason for the rule is well stated in the case of *Waldrep* v. *Railroad & Banking Co.*, 7 Ga. App. 342 (66 S. E. 1030), where the court said:

"The inference that the railroad company has impliedly invited, or at least has impliedly licensed, the public to pass along or cross its tracks, which may exist as to other portions of its right of way, and

which at most is an exception by which a trespasser is.raised to a licensee, cannot be raised as to switchyards, because such an inference is so inconsistent with the continuous use of its tracks for switching purposes as not to admit of the presumption that there is an invitation or permission granted by the railroad to the public. * * * The supreme court and this court have both recognized that the peculiar use to which that portion of a railroad company's tracks included in its switchyard is subjected is fatal to the creation of any inference which admits of joint occupancy at any time by any member of the public" (citing *Grady* v. *Railroad & Banking Co.*, 112 Ga. 668 [37 S. E. 861]).

While the evidence in the case at bar clearly shows that the track upon which plaintiff's decedent met his death was used from time to time by trespassers and that such use was known to the inferior employees of the defendant, the use thereof fell far short of that made to appear in the *Winnie Case,* and our former opinion cannot stand unless that case is squarely overruled. I am of opinion that our orginal determination of the case at bar, under our own authorities, was wrong. The question of gross or discovered negligence is not involved.

The report of the Interstate Commerce Commission shows that for the year ending June 30, 1914, 5,471 men, women, and children lost their lives in the United States while trespassing upon railroad tracks and cars, and that in the same period 6,354 other men, women, and children were injured in the same manner. The custom of our citizens to use the private rights of way of steam railroads as footpaths is extremely common. Railroad companies are practically helpless so far as preventing such use is concerned. The inferior employees of every railroad know of such use, and if the duty to maintain a lookout, and operate trains with reasonable care, having reference to the safety

of trespassers, is imposed upon the railroads by reason of such knowledge, their efficiency as public agencies will be seriously impaired.

The judgment is affirmed.

Stone, C. J., and Kuhn, Ostrander, Bird, Moore, Steere, and Person, JJ., concurred.