*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JACOB MARION, by Guardian and Next Friend,
MONICA MARION,

Plaintiff-Appellant

v

GRAND TRUNK WESTERN RAILROAD
COMPANY, STEVEN GOLOMBESKI, and JESSIE
WILSON,

Defendants-Appellees.

FOR PUBLICATION
March 10, 2022
9:00 a.m.

No. 352355
Wayne Circuit Court
LC No. 18-005516-NO

Before: GLEICHER, P.J., and CAVANAGH and LETICA, JJ.

GLEICHER, P.J.

Jacob Marion, age 14, was struck by a train as he walked down the tracks while listening to music on his earbuds. According to plaintiff's expert witness, the train's engineer saw the teenager in time to have stopped the train. The circuit court acknowledged that a question of fact existed regarding when the train's engineer applied the brakes. Nevertheless, the court granted summary disposition in favor of defendants, ruling that the engineer had no legal duty to stop the train, or to even slow down, after spotting Jacob on the tracks and realizing that he was not responding to the train's horn.

The circuit court's opinion rested on cases decided by the Michigan Supreme Court between 1899 and 1933. The court incorrectly interpreted those cases, ignored more recent and relevant caselaw, and overlooked fundamental components of the concept of duty. We reverse and remand for further proceedings.

## I. UNDERLYING FACTS AND PROCEEDINGS

Jacob Marion, age 14, regularly walked on or near the railroad tracks between his home and his high school. Approximately three-quarters to one mile before the train struck Jacob, the train's conductor and engineer saw the young man walking "in the middle of the tracks" with his back to the train. The engineer, Jesse Wilson, routinely sounded the train's horn as the train approached the Oak Street crossing. At approximately the same time, Wilson and the conductor,

-1-

Steven Golembeski, spotted Jacob in the distance. Golembeski remarked: "The kid doesn't look like he's going to move." According to Wilson, both he and Golembeski realized Jacob's peril before the train reached the Oak Street crossing. Under questioning by his counsel, Wilson testified as follows:

> *Q*. When you had the conversation with Mr. Golembeski where he indicated that he didn't think maybe the pedestrian heard the - - the horn, were you at the crossing or almost upon the crossing at that time?
>
> *A*. We were - - we were approaching the crossing.
>
> *Q*. Were you very nearly on it?
>
> *A*. Excuse me?
>
> *Q*. Were you very nearly on the crossing?
>
> *A*. Yes.
>
>     Mr. Cafferty: The Oak Street crossing, is that - -
>
> *Q*. The Oak Street crossing.
>
> *A*. It was before - - that conversation was before the - - the crossing.
>
> *Q*. But it was after you had started blowing the horn.
>
> *A*. Yes.

When the train "got over the crossing," Wilson again recounted that Jacob was "just not responding." Wilson then sounded the horn in emergency mode but still did not apply the brakes. When asked whether he also applied the brakes at that point Wilson responded, "No, not until after I was giving him all of the warning that I could give him." Wilson conceded that he could have applied the brakes at that point, but in his view, it would have been impossible to have stopped the train in time.

According to plaintiff's expert's interpretation of the train's event recorder, Wilson did not activate the brakes until seven-tenths or eight-tenths of a second before the train struck Jacob. Plaintiff's expert testified that when the train crew spotted Jacob and observed that he was not reacting to the horn, they should have immediately activated the brakes. Once an emergency brake was finally applied, the train stopped in 719.5 feet. If the brake had been applied when Jacob was first observed to be nonresponsive to the horn, the expert opined, the accident would have been avoided.

The circuit court granted summary disposition under MCR 2.116(C)(10), concluding that "children . . . are well aware of the dangers of trains," and that "no negligence can be imputed" to train operators if they attempted to alert Jacob and he did not respond. Relying largely on *Piskorowski v Detroit, Grand Haven & Milwaukee R Co*, 121 Mich 498; 80 NW 241 (1899), a

case involving a deaf plaintiff who was struck by a hand-car, the court summarized that "unless . . . train operators are aware of [a] person's deafness, no negligence can be imputed to them if they attempted to alert the person."

## II. ANALYSIS

The central question presented in this appeal is whether a train operator has a duty to attempt to preserve the life of a trespasser in peril on the tracks. Defendants contend that a train crew has no duty to stop or slow a train until the crew determines that a collision is "imminent." The circuit court agreed. The caselaw does not support such a rule. We begin by setting the historical legal stage.

The doctrine of contributory negligence, which eliminated a plaintiff's ability to pursue a claim if the plaintiff bore any fault at all for his or her own injury, permeated tort law for most of Michigan's history. Our Supreme Court's first description of the doctrine summarized: "It is a well settled principle of law, that where an injury, of which a plaintiff complains, has resulted from the fault or negligence of himself, or where it has resulted from the fault or negligence of both parties, without any intentional wrong on the part of the defendant, an action cannot be maintained." *Williams v Mich Central R Co*, 2 Mich 259, 265 (1851). *Williams* arose from a train accident. So did a subsequent case in which Justice CHRISTIANCY pointedly criticized the contributory negligence rule:

> The law is too well settled by the overwhelming weight of authority, both in England and the United States, to be now disputed, that, in an action like this, to recover for an injury arising from negligence of the defendant in carrying on their lawful business without wanton or intentional wrong, the plaintiff can not recover if his own negligence directly or proximately contributed to produce the injury, though the defendant's negligence may also have concurred in producing the result. *This rule, it is true, often, and perhaps generally, fails to produce justice; and, upon abstract principles of right and wrong, may be said to be frequently unjust in its operation. Justice might seem to require that each should bear the loss in the proportion they had respectively contributed to the injury.* [*Lake Shore & Mich Southern R Co v Miller*, 25 Mich 274, 276-277 (1872) (emphasis added).]

It is no coincidence that both *Williams* and *Lake Shore* involved trains. Before the automobile—and for many years after the first cars hit the roads—trains were the predominant form of transportation in Michigan. Like the cars that replaced them as instrumentalities of regular travel, locomotives caused countless accidents, deaths, and injuries. The contributory negligence doctrine shielded railroad companies from liability for most of them.

In *Williams*, 2 Mich at 260, a train struck and killed the plaintiff's horses which had been grazing on a track. The Supreme Court unhesitatingly applied the contributory negligence rule. Justice CHRISTIANCY's misgivings about the doctrine arose in a far different context. In *Lake Shore*, 25 Mich at 275-276, a woman sitting in a wagon was hit by a train at a highway crossing. The "unjust" nature of contributory negligence was not lost on the Court. But any reservations about the equities were cast aside in favor of protecting the railroads:

If, however, he sees a child of tender years upon the track, or any person known to him to be, or from his appearance giving him good reason to believe that he is, insane, or badly intoxicated, or otherwise insensible of danger, or unable to avoid it, he has no right to presume that he will get out of the way, but should act upon the belief that he might not, or would not, and he should therefore take means to stop his train in time. A more stringent rule than this—a rule that would require the engineer to check his speed or stop his train, whenever he sees a team crossing the track or a man walking on it, far enough ahead to get out of the way in time, until he can send ahead to inquire why they do not; or which would require the engineer to know the deafness or blindness, or acuteness of hearing or sight, or habits of prudence or recklessness, or other personal peculiarities of all those persons he may see approaching, or upon the track, and more especially of all those who may be approaching a crossing upon the highway, though not seen—any such rule, if enforced, must effectually put an end to all railroads, as a means of speedy travel or transportation, and reduce the speed of trains below that of canal-boats forty years ago; and would effectually defeat the object of the legislature in authorizing this mode of conveyance. [*Lake Shore*, 25 Mich at 279-280.][1]

A review of train injury cases decided before 1979, when the Supreme Court replaced the doctrine of contributory negligence with comparative negligence in *Placek v City of Sterling Hts*, 405 Mich 638; 275 NW2d 511 (1979), reveals that most began and ended with the conclusion that the plaintiff's negligence, however slight, foreclosed recovery. Echoing Justice CHRISTIANCY, Justice WILLIAMS observed in *Placek*, 405 Mich at 652, "There is little dispute among legal commentators that the doctrine of contributory negligence has caused substantial injustice since it was first invoked in England in 1809."

It is against this backdrop that we turn to *Piskorowski*, the case the circuit court found controlling under the facts presented here.

## A. *PISKOROWSKI*

Anthony Piskorowski was 42 years old and deaf. While returning home from his job, he walked south on a train track used only by trains going north, which allowed him to see any approaching trains. When he turned to cross the tracks and "stepped across the rail," he "was struck by a hand-car" operated by the defendant railroad company, and was severely injured.[2] *Piskorowski*, 121 Mich at 499. "The hand-car was propelled by four men, with a foreman in charge of a hand-brake." *Id.* The men on the hand-car had shouted a warning of their approach, but

---

[1] The first sentence of this quotation is directly relevant to the case at hand—a point discussed in greater detail below.

[2] For a description of a hand-car, see *Miller v Ann Arbor R Co*, 196 Mich 297, 298-299; 162 NW 1025 (1917) (involving a hand-car that "was of the ordinary type, and was propelled by hand power. When being propelled, men stood upon the platform of said car, working two handles up and down, rods connected the handles with gearing beneath the platform, which caused the wheels to revolve").

Piskorowski, of course, did not hear it. "When between 12 and 15 feet away from the plaintiff they again shouted, and plaintiff again failed to pay any attention, and the men on the hand-car made no effort to slow up." *Id*. A third shout was to no avail, and the hand-car hit Piskorowski. *Id*. at 500.

Piskorowski's negligence claim rested on two arguments. First, to avoid the application of contributory negligence he contended that the defendant's employees were grossly negligent. *Id*. "The term 'gross negligence' . . . has a definite meaning, when referred to as authorizing a recovery for a negligent injury, notwithstanding the contributory negligence of the plaintiff." *Knickerbocker v Detroit, Grand Haven & Milwaukee R Co*, 167 Mich 596, 602; 133 NW 504 (1911). The Supreme Court rejected that the hand-car operators had been grossly negligent given that they shouted warnings and had no reason to know of Piskorowski's deafness. *Piskorowski*, 121 Mich at 500.

Piskorowski's second claim was that a flagman in the area should have warned him of the oncoming hand-car.[3] *Id*. The Court rejected this argument, too, on contributory negligence grounds: "It seems to us that this question is governed by the same considerations which rule the former." *Id*. Like the hand-car operators, the flagman had no reason to know of Piskorowski's deafness. The Court concluded, "In this case, had [the flagman] known all the facts, he would not be required to assume that plaintiff would ignore the warning already given, or that he would change his course so as to come in contact with the car." *Id*. at 501.

In a sense, the facts of *Piskorowski* are similar to those presented here, in that both plaintiffs were unable to hear a warning. *Piskorowski*, however, does not describe the duty of an engineer piloting a locomotive. A hand-car is not a train,[4] a flagman is not an engineer, and a duty to warn claim is not a claim for the negligent failure to stop a moving train in time to prevent injury. Moreover, the Court's holding in *Piskorowski* was compelled by the doctrine of contributory negligence. Once the Court determined that Piskorowski bore responsibility for his injury, the die was cast. Recognizing the legal dominance of the contributory negligence doctrine, Piskorowski did not even try to bring a negligence claim against the hand-car operators, eliminating the need for the Court to address their standard of care. That is why *Piskorowski* simply does not stand for the proposition for which the circuit court cites it.

---

[3] "The flagman's duty is to know of the approach of trains, and to give timely warning to all persons attempting to cross the railroad track, and the public have [sic] a right to rely upon a reasonable performance of that duty." *Richmond v The Chicago & Western Mich R Co*, 87 Mich 374, 382; 49 NW 621 (1891) (quotation marks and citation omitted).

[4] When analyzing duty, the difference between a hand-car powered by four men and traveling at slow speed and a modern-day locomotive cannot be disregarded. The magnitude of the risk posed by an object or conduct is an integral aspect of every duty equation. See *Moning v Alfono*, 400 Mich 425, 433-434; 254 NW2d 759 (1977), and *Buczkowski v McKay*, 441 Mich 96, 103; 490 NW2d 330 (1992).

## B. SUPREME COURT PRECEDENT RELEVANT TO THIS CASE

Abundant precedent contradicts the circuit court's ruling and defendants' argument, including cases decided in the contributory negligence era. While the doctrine of contributory negligence was in effect, adult plaintiffs hit by trains faced the almost insurmountable hurdle of proving freedom from fault. In cases involving children, however, the Supreme Court was free to describe the duties of care applicable to a train crew. Train employees owed adults and children several duties of care: to keep a "sharp lookout" for people on the tracks, and to make reasonable efforts to avoid hitting them. But because contributory negligence precluded an adult from pursuing virtually any claim arising from an injury by a moving train, a railroad defendant's duty to protect and preserve life was most clearly articulated in cases involving children.[5]

Fourteen years before *Piskorowski* was decided, the Supreme Court considered a case roughly analogous to the one now before us. In *Keyser v Chicago & Grand Trunk R Co*, 56 Mich 559, 560; 23 NW 311 (1885), a two-and-a-half-year-old child was struck and injured by a moving train where a private road crossed the tracks. The plaintiff alleged that the train personnel failed to keep a proper lookout and failed to sound the whistle. *Id*. The Supreme Court reversed a defense verdict, holding that the trial court had incorrectly charged the jury that the railroad employees were not "required to keep a vigilant lookout in this locality" or to give danger signals. *Id*. at 561 (quotation marks and citation omitted). The evidence supported that the trainmen had seen "something" on the track that "resembled a stick of wood" some 2,500 to 3,000 feet ahead of the train, but apparently did not slow down at that point. The "stick of wood" was the child, lying on the tracks. *Id*. at 561-562. The Supreme Court held that the appearance of "something" on the track

> was of a character to call for increased vigilance on the part of defendant's train-men in determining the character of the apparent obstruction. It should have, at least, caused the engineer to slow down the speed of his engine to such a rate that, in approaching it, he could have stopped his train, if necessary, to prevent injury before reaching the object of danger. [*Id*. at 562.]

Injury could have been avoided, the Court explained, "by proper care and caution exercised by defendant's engineer." *Id*.

In 1888, the Supreme Court reiterated in another case involving a child that the railroad defendants had a duty to keep a "look out for accident or danger to individuals upon the track" and in that case, negligently failed to do so. *Battishill v Humphreys*, 64 Mich 514, 520; 38 NW 581 (1888). Had "the persons in charge of that train perform[ed] their duty of keeping a lookout," the Court asserted, "they would have seen the child in time to stop the train and avoid the accident. If they had seen it upon the track the same distance from it that [the eyewitnesses to the accident] saw it, they could have stopped the train, and avoided the injury to plaintiff." *Id*. at 520-521. In

---

[5] In *Baker v Alt*, 374 Mich 492, 505; 132 NW2d 614 (1965), the Supreme Court reconciled several cases offering different age-cutoffs for the application of contributory negligence, holding that "an infant under seven years of age is incapable of contributory negligence." (Quotation marks and citation omitted)

1890, the Court again confirmed that a train must reduce its speed when a danger ahead is spotted: "Only when the engineer, in the exercise of due caution, sees danger, is he required to slacken the speed. He is then bound, from regard for the rights of all parties concerned, to take all proper steps to avoid the danger." *Robinson v The Flint & Pere Marquette R Co*, 79 Mich 323, 329; 44 NW 779 (1890).

These cases involving children advance the same general duty principle as described by Justice CHRISTIANCY in *Lake Shore*. If an engineer

> sees a child of tender years upon the track, or any person known to him to be, or from his appearance giving him good reason to believe that he is, insane, or badly intoxicated, or otherwise insensible of danger, or unable to avoid it, *he has no right to presume that he will get out of the way, but should act upon the belief that he might not, or would not, and he should therefore take means to stop his train in time.* [*Lake Shore*, 25 Mich at 279-280 (emphasis added).]

*Piskorowski* did not silently overrule all this precedent. *Piskorowski* did not announce a new, radical rule abrogating a duty to preserve life and limb. Rather, the circuit court misinterpreted that case, failed to place it in a legally historical context, and neglected to consider the relevant cases implicating duty that followed.

Post-*Piskorowski*, in yet another case involving serious injury to a child struck by a train, the Supreme Court reversed a directed verdict for the defense. The Court held that the evidence supported that the train personnel had not been keeping a proper lookout and that "[i]t was their general duty to run the train with reasonable care and watchfulness." *Huggett v Erb*, 182 Mich 524, 536; 148 NW 805 (1914). The Court continued, "Plaintiff's evidence here clearly tends to show that her peril might have been known to the trainmen in time to avoid the injury, had they but exercised the reasonable care, in the operation of their train, which their duties under the circumstances demanded." *Id*. at 538.

In addition to the contributory negligence bar, adults (and teenagers, such as Jacob) faced a second barrier to recovery in cases arising from train injuries. As trespassers on tracks owned by the railroad companies, such plaintiffs were (and likely still are) owed a reduced standard of care. Yet the Supreme Court has never proposed that even as to trespassers, a railroad has *no* duty to attempt to avoid striking a person who apparently does not hear or heed a warning to get off the tracks. For example, in *Bloch v Detroit United R*, 211 Mich 252, 259; 178 NW 670 (1920), the Court approved the following instruction: "There was no duty incumbent upon the motorman to stop his car, or take measures so to do *until he saw that the plaintiff was not going to get off the track*, or was in such a position that he could not get off the track in time to avoid being struck." (Emphasis added, quotation marks omitted). And in *Johnson v New York Central R Co*, 357 Mich 40, 53; 97 NW2d 769 (1959), four members of our then eight-member Supreme Court characterized as a jury question whether an engineer had violated the standard of care by failing to stop sooner, despite the plaintiff's contributory negligence:

> Defendant's engineer did not apply his emergency brakes until approximately 640 feet east of the crossing when, as he stated, it became obvious to him that the truck was not going to stop, even though when he rounded the curve 2,200 feet east of

the tracks he testified he saw plaintiff's long gasoline truck. He also saw and knew the switch engine standing on the south main tracks was activating the flasher signals. He also knew that highway US-12A crossed the tracks on an angle in a northwesterly direction, making it difficult for the driver to see to the east. Despite all of this information, rather than applying the emergency brakes immediately, he simply applied the service brakes and then during the last few seconds switched to the emergency brakes. Since reasonable minds might differ as to whether his actions constituted reasonable care and caution under these circumstances, we feel a question of fact for the jury was created.

*Risbridger v Mich Central R Co*, 188 Mich 672, 685; 152 NW 961 (1916), provides yet another example of a decision recognizing a railroad's duty of care, albeit a narrow one, applicable to adults negligently walking on a train track. The plaintiff's decedent in *Risbridger* worked for the defendant railroad and was struck by a locomotive between 5 and 6 a.m. He was walking to work on a path next to the railroad tracks that was used by other employees and citizens of the area. *Id.* at 674. The locomotive had no lights and did not sound a warning at the time it hit Mr. Risbridger. The train crew did not realize that a man had been hit by the train and did not stop. *Id.* at 675.

The Court's first opinion in *Risbridger* reversed a directed verdict, finding that Mr. Risbridger was a licensee rather than a trespasser, and that the railroad had arguably failed to use due care in running its train without lights. *Id.* at 677-679. On rehearing, the Court reversed itself, finding that Mr. Risbridger was a trespasser and affirming the directed verdict. *Id.* at 688. Nevertheless, the "general doctrine affecting the duty of railway companies to trespassers" adopted by the Court includes a duty to "exercise ordinary care after discovering [a trespasser's peril] not to injure him":

> Except at public crossings and a few other places, the right of way of a railroad company is its exclusive property and it owes a trespasser no greater duty than any other owner of property would owe a trespasser under the same circumstances. The railroad company is not required to anticipate the presence of a trespasser on its track or property, and this rule applies to children as well as to grown persons. The railroad company owes no higher duty to a trespasser than not to wantonly or willfully injure him. It is only required to exercise ordinary care after discovering his peril not to injure him. The railroad company owes no duty to such persons to employ competent operatives, nor to keep its tracks safe for pedestrians by the use of only sound ties. It is under no obligation to stop its trains at railroad junctions merely for the benefit of trespassers. [*Id.* at 685 (quotation marks and citation omitted).]

Although this duty can be fairly described as minimal, it is far more stringent than the "no duty" rule proposed by defendants and the circuit court. See also *Calvert v Detroit United R*, 202 Mich 311, 326; 168 NW 508 (1918) (involving a streetcar rather than a train, in which the Court approved an instruction stating that "the admitted discovery of plaintiff's peril by the agents of defendant, it became the duty of those agents to seek to avert the threatened collision; neglect or refusal to perform the duty being subsequent negligence").

This review of the post-1899 caselaw demonstrates that the circuit court's interpretation and application of *Piskorowski* are unsupportable by the precedent of that era. An examination of modern tort law supplies additional grounds for reversing the circuit court's grant of summary disposition.

## C. MODERN TORT LAW

In a sense, the contributory negligence doctrine relieved defendants of an obligation to exercise reasonable care toward negligent plaintiffs. Without question, the doctrine truncated the development of the common law regarding duty, as in a vast number of cases the subject was not reached due to evidence of the plaintiff's fault.

With the abolition of contributory negligence and its replacement by comparative negligence, our Supreme Court has on several occasions explored the concept of duty and described its parameters.

"[T]he ultimate inquiry in determining whether a legal duty should be imposed is whether the social benefits of imposing a duty outweigh the social costs of imposing a duty." *In re Certified Question from the Fourteenth Dist Court of Appeals of Texas (Miller v Ford Motor Co)*, 479 Mich 498, 505; 740 NW2d 206 (2007). Measured against this standard, there should be no debate that a train engineer has a duty to stop or slow down when a person in a train's path fails to respond to a warning signal. The duty inquiry includes an evaluation of several relevant factors: "the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented." *Id*. (quotation marks and citation omitted). The Supreme Court has "recognized" that "[t]he most important factor to be considered [in this analysis] is the relationship of the parties." *Hill v Sears, Roebuck & Co*, 492 Mich 651, 661; 822 NW2d 190 (2012) (alterations in original).

The common law defines the relationship between Jacob and defendant as one of trespasser and landowner. Modern tort law establishes the boundaries of the duties owed to trespassers.

> The common law categories are a shorthand, in well-established classes of cases, for the duty analysis; they, too, are based on the relationship of the parties, the nature of the risk, the ability to exercise care, and considerations of public policy. The only difference is that, through the evolution of our common law, the duty analysis has already been performed in respect of invitees, licensees (social guests), and trespassers. [*Rowe v Mazel Thirty, LLC*, 209 NJ 35, 45; 34 A3d 1248 (2012).]

In *Lyshak v City of Detroit*, 351 Mich 230, 249; 88 NW2d 596 (1957), the Supreme Court considered the duties owed to children trespassing on a golf course. The Court adopted the analysis provided in the first Restatement of Torts:

> Here we have injury from dangerous activities conducted in a limited area which trespassers in general are known to frequent. In this situation a Restatement, Torts, § 334, well states the preferable and modern principle of law, with which we are impelled to agree:

> A possessor of land who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area thereof, is subject to liability for bodily harm there caused to them by his failure to carry on an activity involving a risk of death or serious bodily harm with reasonable care for their safety.

The Supreme Court reaffirmed "[t]he cardinal rule stated in *Lyshak*" in *Nielsen v Henry H Stevens, Inc*, 359 Mich 130, 132; 101 NW2d 284 (1960), a case arising from injuries sustained by a seven-year-old riding his bike on a trucking company's property.

> 2 Restatement Torts, 2d, § 336, pp 190-191 (1965), reiterates these principles, almost verbatim:

> A possessor of land who knows or has reason to know of the presence of another who is trespassing on the land is subject to liability for physical harm thereafter caused to the trespasser by the possessor's failure to carry on his activities upon the land with reasonable care for the trespasser's safety.

Comment b addresses the precautions required when a land possessor's activities are "highly dangerous," declaring:

> the gravity of the danger threatened by an activity which, unless carefully carried on, is likely to cause death or serious bodily harm, requires the possessor to exercise reasonable care not only when he knows that a trespasser is at some point made dangerous by it, or is reasonably certain or regards it as highly probable that he is at such a point, but also when he sees an object or hears a sound which causes him to realize that there is a substantial chance that the trespasser may be at such a point. This is in accordance with the tendency of the law not only to require a greater amount of care where life and limb are at stake, than where only some minor harm is likely to occur, but also to extend the duty of protection to persons to whom no duty would be owing if a less serious harm were threatened. [*Id*., cmt b, p 191.]

One of the illustrations offered in this section of the Restatement strongly resembles the facts of this case:

> A is walking along the right of way of the X & Y Railroad Company. The engineer of an approaching train sees A while 200 yards away. The train is going so slowly that it could readily be stopped within 100 yards. The engineer blows the whistle. A, hearing it, turns around and apparently sees the train approaching. The engineer is entitled to assume that A knows of the approach of the train and will protect himself from harm by stepping off of the tracks before it reaches him. *If, however, the engineer, after blowing the whistle, sees that A does not hear the warning or is unable or obviously intends not to obey it, the Railroad Company is subject to liability for running down A if the engineer fails to take reasonable care, after reaching a point 100 yards from A, to stop the train so as to avoid running A down.* [*Id*., cmt d, illustration 3, p 193 (emphasis added).]

These Restatement provisions reflect modern duty concepts consistent with the contours of the duty analysis embraced by our Supreme Court. They align with Michigan's long-standing common law of the duty applicable to railroads in situations such as Jacob Marion's. They instruct that the defendants had a duty to attempt to stop the train when it was apparent that Jacob did not hear the warning and was not going to step off the tracks.

The common law imposes a general duty to exercise ordinary and reasonable care and caution, i.e., the care and caution an ordinarily careful and prudent person would use under the circumstances. See, e.g., *Zarzecki v Hatch*, 347 Mich 138, 141; 79 NW2d 605 (1956). Similarly stated, the common law " 'imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to unreasonably endanger the person or property of others.' " *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 165; 809 NW2d 553 (2011), quoting *Clark v Dalman*, 379 Mich 251, 261; 150 NW2d 755 (1967) ("This rule of the common law arises out of the concept that every person is under the general duty to so act, or to use that which he controls, as not to injure another."). At a minimum, defendants had an obligation to refrain from wanton and willful misconduct. See, e.g., *Stitt v Holland Abundant Life Fellowship*, 462 Mich 591, 596; 614 NW2d 88 (2000).

Exactly when defendants could and should have stopped the train represent quintessential fact questions. And whether stopping in time was possible is yet another question of fact. But viewed in the light most favorable to plaintiff, the train crew saw Jacob from almost a mile away and, despite numerous horn blasts and the train's lights, recognized that Jacob did not change his course in the slightest. Nevertheless, the train did not slow and its emergency brake was not applied until it was too late. This was not a sudden, unexpected trespasser who happened across the tracks. Rather, based on the testimony of record, a reasonable jury could conclude that defendants had Jacob in plain sight and recognized his peril for a period of time sufficient to react so as not to strike him.

We reverse and remand for further proceedings. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Mark J. Cavanagh

-11-